IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

TAMMY LYNN SHAKESPEARE-FORE,

    Plaintiff,

vs.

CAROLYN W. COLVIN, Commissioner of
Social Security,

    Defendant.

No. C14-0062

ORDER ON JUDICIAL
REVIEW

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................ 2

II.    PRINCIPLES OF REVIEW ................................. 2

III.   FACTS .............................................. 4
    A.   Shakespeare-Fore's Education and Employment Background ...... 4
    B.   Administrative Hearing Testimony ....................... 4
        1.   Shakespeare-Fore's Testimony ..................... 4
        2.   Vocational Expert's Testimony ..................... 5
    C.   Shakespeare-Fore's Medical History ...................... 6

IV.   CONCLUSIONS OF LAW ................................ 14
    A.   ALJ's Disability Determination ......................... 14
    B.   Objections Raised By Claimant ......................... 16
        1.   Dr. Kilburg's Opinions ......................... 17
        2.   Credibility Determination ....................... 20
        3.   RFC Assessment ............................. 25
        4.   Hypothetical Question ......................... 31

V.    CONCLUSION ....................................... 32

VI.   ORDER ............................................ 32

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Tammy Lynn Shakespeare-Fore on May 20, 2014, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits.[1] Shakespeare-Fore asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Shakespeare-Fore requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

---

[1] On January 2, 2015, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary

outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

### A. Shakespeare-Fore's Education and Employment Background

Shakespeare-Fore was born in 1967. She is a high school graduate. Additionally, Shakespeare-Fore earned a degree in travel and tourism from Hamilton Business College. Her past work includes jobs as a telemarketer, sales representative, photographer, and sales marketing trainer. At the time of the administrative hearing, Shakespeare-Fore testified that she was an "ordained" minister and was working as a puppy daycare trainer and photographer.[2] When asked how many hours she worked per week, Shakespeare-Fore explained that "[i]t fluctuates. I haven't watched a dog in probably a month. This week I have a dog coming for two days. . . . I don't have anybody currently that I'm going to be marrying, and I don't have any photography set up."[3]

### B. Administrative Hearing Testimony

#### 1. Shakespeare-Fore's Testimony

At the administrative hearing, Shakespeare-Fore testified that she suffers from back shoulder, and neck pain. She stated that her shoulder and neck pain also cause her to get migraine headaches. She stated that she gets migraines three or four times per month. Shakespeare-Fore also indicated that she suffers from low back pain, particularly in her left hip and leg. According to Shakespeare-Fore, she also has numbness and tingling in

---

[2] Shakespeare-Fore testified that she did not receive any seminary training; but instead, got her minister's license over the internet by paying for it. *See* Administrative Record at 51.

[3] Administrative Record at 49.

4

both feet. She has been prescribed a cane by her chiropractor. She also takes medication for her pain, but when the pain is not alleviated by the medicine, Shakespeare-Fore stated that she needs to lie down to "reset" her pain levels. She also stated that she needs to take regular breaks during the day, about every hour for 15 minutes at a time.

Shakespeare-Fore further explained that she also has difficulties with depression, ADHD, anxiety, anger, and poor sleep. She testified that she becomes easily angry with her husband and people in stores. She further stated that she wakes up "exhausted" due to her sleeping problems.

## 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to:

> lift and/or carry, push and/or pull 10 pounds. The individual can stand and/or walk for two hours in a workday. The individual can sit for six hours in a workday. The individual can balance, stoop, kneel, crouch, climb ramps or stairs occasionally. The individual cannot crawl, cannot climb ladders, ropes, or scaffolds. The individual can perform simple repetitive tasks and some detailed tasks.

(Administrative Record at 84.) The vocational expert testified that under such limitations, Shakespeare-Fore could perform her past work as a telemarketer and a receptionist. The ALJ modified her hypothetical question to indicate that the individual "would be able to sit for only 30 minutes at a time then would need to stand for 30 minutes and so on throughout the day[.]"[4] The vocational expert testified that under the modified hypothetical, Shakespeare-Fore remained capable of performing her past work as a telemarketer and receptionist. Next, the ALJ inquired whether those jobs would be available if the hypothetical individual was unable to work with the public. The vocational expert responded that the telemarketing and receptionist jobs would be unavailable under

---

[4] Administrative Record at 85.

5

such circumstances, but Shakespeare-Fore could perform the following sedentary jobs: (1) document preparer, (2) addresser, and (3) ticket counter. Lastly, the ALJ asked whether missing work four times per month would affect the identified occupations. The vocational expert answered that such jobs "would not be available on a full-time competitive basis."[5]

Shakespeare-Fore's attorney also questioned the vocational expert:

> Q: What if the individual had a restriction of rare sitting, rare standing, occasional walking, no bending? Would that person be able to perform any of those jobs?
> A: No.
> Q: And if a person because of fibromyalgia had to take a break say every hour or hour and a half would they be able to -- for 20 minutes would they be able to perform any of those jobs?
> A: No, not competitively.

(Administrative Record at 87.)

### C. Shakespeare-Fore's Medical History

On July 14, 2009, Shakespeare-Fore underwent an MRI for low back pain. Dr. C.E. Clark, M.D., interpreted the MRI and found mild loss of disc space height with disc desiccation and bulging at the L4-L5 level. Dr. Clark also found a small right paracentral protrusion at L3-L4. Finally, Dr. Clark found generalized facet arthropathy in the mid and lower spine, particularly at the L3-L4 and L4-L5 levels.

On September 28, 2009, Shakespeare-Fore met with Dr. Kenneth McMains, M.D., for an independent medical examination. Dr. McMains reviewed Shakespeare-Fore's medical history as follows:

> Ms. Shakespeare-Fore reports that on 6/2/09 while performing her normal activities as a photographer, she tripped over a drop sheet and started to fall backwards to her right, realized

---

[5] *Id.* at 87.

there was a small child on her right, and then while in the air, twisted to the left landing on her left hip and her outstretched left arm. The worker reports being embarrassed by the fall, tried to shake it off, and continued working. After a couple of hours, her back pain started to increase, as did her shoulder pain, and the following day she was unable to go to work because of the increasing pain. She then waited a couple of days . . . and saw her primary care physician, Dr. Beer, and was started on treatment with medication and therapy.

Because of increasing pain in her low back with radiation to the left leg, the worker then underwent an MRI of the lumbar spine on 7/14/09[.] . . . There was nothing on the MRI that appeared to be surgical. Because of her continued pain, Ms. Shakespeare-Fore was eventually referred to Dr. Mouw for a neurosurgical consultation, with Dr. Mouw stating that the worker was non-surgical and recommended therapy and conservative treatment. Eventually, Ms. Shakespeare-Fore was referred to Dr. Michael Jackson at Mercy Occupational Health for continued care. Dr. Jackson diagnosed the worker with: 1) left shoulder pain and 2) left piriformis syndrome and recommended continued conservative treatment.

(Administrative Record at 609.) Shakespeare-Fore reported to Dr. McMains that she had minimal improvement since the onset of her pain, and continued to have left shoulder, low back, and left lower extremity pain. Shakespeare-Fore rated her pain at 7.5 on a scale of 1 to 10, with 10 being the most severe pain. Upon examination, Dr. McMains found: (1) full range of motion and normal strength in the upper extremities, (2) full range of motion in the lower back, (3) normal heel-to-toe walking, and (4) negative bilateral leg raising. Dr. McMains diagnosed Shakespeare-Fore with chronic left piriformis syndrome and left shoulder strain. Dr. McMains opined that Shakespeare-Fore should expect a full recovery of her shoulder and low back pain with piriform injections and aggressive therapy. Dr. McMains concluded that:

The shoulder should continue to improve with normal daily activity with no specific treatment needed. Following the

7

piriformis injection and therapy, there is expectation of case closure over the next 4 to 6 weeks with no permanent partial impairment or limitations on returning to her normal work activity.

(Administrative Record at 612.)

On November 16, 2009, Shakespeare-Fore met with Dr. F. Manshadi, M.D., for an independent medical examination. Dr. Manshadi noted Shakespeare-Fore's current symptoms as follows:

she has a dull ache which is piercing in the left buttock and left sacroiliac joint area. She reports the pain is constant in the low back and the buttock and she rates it at 8 out of 10. She reports her left shoulder pain is intermittent but comes on with lifting of maybe 3 to 5 pounds. The pain is over the left trapezius area and goes to the periscapular region.

(Administrative Record at 619.) Upon examination, Dr. Manshadi found that Shakespeare-Fore's strength in her lower extremities was 5/5, reflexes were normal, and knees and ankles were symmetrical. Dr. Manshadi noted that her left leg was shorter than her right leg. Dr. Manshadi also found that her left shoulder range of motion was limited. Dr. Manshadi diagnosed Shakespeare-Fore with left-sided SI joint dysfunction, left piriformis syndrome, and left shoulder rotator cuff syndrome. Dr. Manshadi recommended that Shakespeare-Fore avoid "any activity which requires continuous twisting, bending or crouching at her waist."[6] Dr. Manshadi also restricted Shakespeare-Fore from repetitious reaching at shoulder level or overhead, and no lifting with left her upper extremity beyond 3 to 5 pounds.

On April 5, 2010, Shakespeare-Fore met with Dr. Harlan J. Stientjes, Ph.D., for a psychological evaluation. Shakespeare-Fore's primary complaints were back pain, anxiety, and depression. Upon examination, Dr. Stientjes diagnosed Shakespeare-Fore

---

[6] Administrative Record at 620.

8

with major depressive disorder and personality disorder. Specifically, Dr. Stientjes opined that her "[h]istory and presentation suggest diffuse personality disorder characteristics. She complains of problems with memory, but that is not consistent with today's evaluation. . . . Prospects for sustained gainful employment are extremely poor."[7] Dr. Stientjes concluded that:

> [Shakespeare-Fore] can understand and remember simple to mildly complex oral and written instructions. Carryover is likely to be inconsistent and she will require more than typical external structure at this time. . . . Interactions with others are impacted by her self-absorption and pain focus. Safety judgment is minimally intact, but with the practice of taking more medication than prescribed (as suggested by one record), she will require monitoring. [Shakespeare-Fore] is likely to refuse to even consider employment.

(Administrative Record at 706.)

On April 22, 2010, Dr. John Tedesco, Ph.D., reviewed Shakespeare-Fore's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment for Shakespeare-Fore. Dr. Tedesco diagnosed Shakespeare-Fore with major depressive disorder and personality disorder. Dr. Tedesco determined that Shakespeare-Fore had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Tedesco concluded that:

> It is alleged that [Shakespeare-Fore] is not able to work based on her physical limitations. From a mental perspective, evidence indicates her impairments are nonsevere. Credibility issues are numerous, but objective evidence finds no significant limitations from a mental perspective.

(Administrative Record at 719.)

---

[7] *Id.* at 706.

On the same date, Dr. C. David Smith, M.D., reviewed Shakespeare-Fore's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Shakespeare-Fore. Dr. Smith determined that Shakespeare-Fore could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, but must periodically alternate between sitting and standing to relieve pain or discomfort, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) limited push and/or pull ability with her left upper extremity.[8] Dr. Smith also determined that Shakespeare-Fore could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Smith further opined that Shakespeare-Fore is limited in reaching all directions with her left arm. Dr. Smith found no visual, communicative, or environmental limitations. Dr. Smith concluded that:

> The evidence in file is consistent in [Shakespeare-Fore's] allegations and physical findings. She consistently reports left sided pain with radiation down the leg. These symptoms could be attributable to either a piriformis syndrome or lumbar radiculopathy, although the MRI and the nature of her injury suggests the former. . . . Her pain during the longitudinal course of her injury has remained left sided without embellishment by [Shakespeare-Fore] and her allegations are credible.

(Administrative Record at 728.)

On October 15, 2010, Dr. Aaron Quinn, Ph.D., reviewed Shakespeare-Fore's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Shakespeare-Fore. Dr. Quinn diagnosed Shakespeare-Fore with history of

---

[8] With regard to Shakespeare-Fore's limitation in pushing and pulling, Dr. Smith explained that "[e]vidence of left shoulder arthropathy would limit push and pull with the left arm to being performed occasionally but not frequently or constantly. The right arm is not restricted." Administrative Record at 722.

ADHD, major depressive disorder, history of PTSD, and personality disorder. Dr. Quinn determined that Shakespeare-Fore had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Quinn found that Shakespeare-Fore was moderately limited in her ability to: maintain attention and concentration for extended periods and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Quinn concluded that:

> [Shakespeare-Fore] is able to complete simple, repetitive tasks on a sustained basis and this conclusion is supported by [medical source] opinions, [and] data from her psychiatrist intake and function report []. [She] is able to interact adequately, but she is noted as doing less socially. [She] is expected to have difficulties with extended attention/concentration and stress management/pace, while her functioning is likely to improve since her re-initiation of [] treatment.

(Administrative Record at 776.)

On February 29, 2012, at the request of DDS, Shakespeare-Fore met with Dr. Roger E. Mraz, Ph.D., for a psychological evaluation. Upon examination, Dr. Mraz determined that:

> [Shakespeare-Fore] was well oriented x3, and had no difficulty with immediate or delayed recall. She had a moderate problem with working memory, indicating that she has a difficult time focusing her attention, concentrating, and holding information in memory long enough to carry out mental operations. This may impact negatively on her ability to remember and carry out complex or lengthy instructions. She also had difficulty remembering and carrying out four simple instructions, which again suggests problems with attention and concentration. She was restless and impulsive

11

throughout the evaluation, which impacted negatively on her
academic skills.

(Administrative Record at 1132.) Dr. Mraz also administered the Beck Depression
Inventory-II test, and Shakespeare-Fore endorsed "significant" symptoms of depression.
She was sad and discouraged much of the time, had difficulty concentrating, lacked energy
and motivation, and regularly felt anxious and irritable. Dr. Mraz diagnosed Shakespeare-
Fore with major depressive disorder, generalized anxiety disorder, and ADHD. Dr. Mraz
concluded that:

> [Shakespeare-Fore] has a long history of being a responsible
> worker, but admitted to having some problems getting along
> with supervisors and coworkers. She prefers routine, and does
> not handle stress well. Immediate and delayed memory skills
> were adequate, but she had a difficult time focusing her
> attention, concentrating, and holding information in memory
> long enough to carry out more than one or two directions at a
> time. This may also be related to her ADHD.

(Administrative Record at 1133.)

On March 19, 2012, at the request of DDS, Shakespeare-Fore met with Dr. George
T. Kappos, M.D., for a consultative examination. In reviewing Shakespeare-Fore's
medical history, Dr. Kappos noted that:

> [Shakespeare-Fore] reports that she started having problems
> with all of her allegations after a fall at work in June
> 2009. . . . She complains of problems with pain in her back,
> neck, left shoulder and left arm ever since the fall. She states
> that she has constant left buttock pain, which ranges from
> 4-7/10, with an average of 5-6/10. . . . She states that she will
> get temporary relief from the pain with treatments, but the
> relief is not long lasting.
>
> She states that she started developing numbness in her left foot
> in around May or June 2011, which has persisted since that
> time. . . . Her pain is worsened with any activity, with
> bending, with sitting for more than 15 to 20 minutes, with

lifting more than ten pounds, and with standing or walking for longer than 15 minutes.

She also reports problems with vertigo, which she states started two months after her injury and has persisted since that time. She complains of dizziness and balance disturbance, but does not have spinning vertigo.

(Administrative Record at 1135-1136.) Upon examination, Dr. Kappos found that Shakespeare-Fore was a "well-developed, well-nourished female who is uncomfortable with prolonged sitting and has to get up and move frequently during the examination. She appeared in no acute distress other than this."[9] Dr. Kappos took note of various restrictions Shakespeare-Fore reported that she had, and incorporated her stated restrictions in his findings.[10] Dr. Kappos' restrictions included: (1) no bending, (2) rare sitting, standing, and stooping, and (3) occasional walking.

On April 21, 2013, at the request of Shakespeare-Fore's attorney, Dr. Kirk Kilburg, M.D., filled out a "Fibromyalgia Medical Source Statement" for Shakespeare-Fore. Dr. Kilburg indicated that Shakespeare-Fore had a history of widespread pain in her neck, low back, upper extremities (left side greater than right side), and lower extremities (left side greater than right side) since 2010. On physical examination, Dr. Kilburg found that Shakespeare-Fore has 16 out of 18 positive tender points. Dr. Kilburg also noted that Shakespeare-Fore demonstrated the following signs and symptoms of fibromyalgia: nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, vestibular dysfunction, numbness and tingling on her left side, breathlessness, anxiety, panic attacks, depression, and chronic fatigue syndrome. Dr. Kilburg estimated that Shakespeare-Fore's daily pain was 6-7 on a scale of 1 to 10 with 10 being the most severe pain. Dr. Kilburg opined that Shakespeare-Fore's prognosis was "fair."

---

[9] Administrative Record at 1137.

[10] See id. at 1138-1139.

Dr. Kilburg determined that Shakespeare-Fore has the following functional limitations: (1) walking less than 1 block, (2) sitting 15 minutes at one time, (3) standing 45 minutes at one time, (4) sitting and standing less than 2 hours in a typical eight-hour workday, (5) needing unscheduled work breaks every hour for 15-30 minutes each time, (6) rarely lifting 10 pounds or less, (7) rarely twisting, stooping, crouching, or squatting, (8) occasionally climbing stairs, and (9) using her left hand and arm for grasping, fine manipulation, front reaching, and overhead reaching only 25% of the time during an eight-hour workday. Dr. Kilburg believed Shakespeare-Fore is capable of low stress work. Finally, Dr. Kilburg opined that Shakespeare-Fore would miss more than four days of work each month due to her impairments or treatment for her impairments.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Shakespeare-Fore is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of

disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description

15

of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Shakespeare-Fore had not engaged in substantial gainful activity since December 15, 2009. At the second step, the ALJ concluded from the medical evidence that Shakespeare-Fore had the following severe impairments: degenerative disc disease of the lumbar spine, fibromyalgia, obesity, depressive disorder, anxiety disorder, ADHD, and personality disorder. At the third step, the ALJ found that Shakespeare-Fore did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Shakespeare-Fore's RFC as follows:

> [Shakespeare-Fore] has the residual functional capacity to perform sedentary work[.] . . . [She] can lift and/or carry and push and/or pull ten pounds. She can stand and/or walk, with normal breaks, for two hours in a workday. She can sit, with normal breaks, for a total of six hours in a workday. [She] can balance, crouch, stoop, kneel, and climb ramps and stairs occasionally. She cannot crawl or climb ladders, ropes, or scaffolds. [She] can perform simple tasks and some detailed tasks. She can work with co-workers and supervisors on a superficial basis. She cannot work with the public.

(Administrative Record at 17.) Also at the fourth step, the ALJ determined that Shakespeare-Fore could not perform her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Shakespeare-Fore could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Shakespeare-Fore was not disabled.

## B. *Objections Raised By Claimant*

Shakespeare-Fore argues that the ALJ erred in four respects. First, Shakespeare-Fore argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Kilburg. Second, Shakespeare-Fore argues that the ALJ failed to properly evaluate

her subjective allegations of pain and disability. Third, Shakespeare-Fore argues that the ALJ's RFC assessment is flawed because the record was not fully and fairly developed, and it is not based on substantial evidence in the record. Lastly, Shakespeare-Fore argues that the ALJ provided a flawed hypothetical question to the vocational expert at the administrative hearing.

### 1. Dr. Kilburg's Opinions

Shakespeare-Fore argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Kilburg. Specifically, Shakespeare-Fore argues that the ALJ failed to properly weigh Dr. Kilburg's opinions. Shakespeare-Fore also argues that the ALJ's reasons for discounting Dr. Kilburg's opinions are not supported by substantial evidence in the record. Shakespeare-Fore concludes that this matter should be remanded for further consideration of Dr. Kilburg's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id..*); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is

inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

Dr. Kilburg is Shakespeare-Fore's primary care physician. In April 2013, at the request of Shakespeare-Fore's attorney, he filled out a "Fibromyalgia Medical Source Statement" for Shakespeare-Fore. In reviewing Dr. Kilburg's treatment of Shakespeare-

Fore, the ALJ noted that Dr. Kilburg initially did not treat Shakespeare-Fore for fibromyalgia. The ALJ explained that:

> After [Shakespeare-Fore] left Dr. Manshadi's service in July 2010, she continued intermittent treatment with her primary care provider, Kirk Kilburg, M.D. Dr. Kilburg noted that [Shakespeare-Fore's] pain improved approximately seventy-five percent as of that June, and [her] follow-up appointments for the remainder of that year concerned short-term, unrelated medical conditions, not back pain or fibromyalgia.

(Administrative Record at 20.) Next, the ALJ indicated that Dr. Kilburg's 2013 opinions were inconsistent with the opinions of Dr. Winthrop Risk, M.D., Shakespeare-Fore's initial fibromyalgia specialist. The ALJ's decision provides:

> Indeed, when [Shakespeare-Fore] established care with neuro-diagnostic specialist Winthrop Risk, M.D., for fibromyalgia in December 2010, he described her symptoms as under control. Moreover, despite [her] complaints of pain associated with squatting, Dr. Winthrop observed [Shakespeare-Fore's] cranial nerves, motor system, sensory system, reflexes, coordination, and gait as normal each time he examined her through March 2011.

(Administrative Record at 20.) Finally, the ALJ specifically addressed Dr. Kilburg's opinion regarding Shakespeare-Fore's functional abilities, and gave his opinion "some" weight. Specifically, the ALJ determined that:

> The evaluation of [Dr. Kilburg] was considered. The doctor appeared to have included every symptom he had seen or [Shakespeare-Fore] reported, while treating [her] for nearly three years. There is no evidence of the need for limiting upper extremity usage. The doctor appears to advocate for [Shakespeare-Fore's] receipt of benefits, rather than an independent treating source. The evaluation is given only some weight.

(Administrative Record). Additionally, in reviewing the ALJ's entire decision, the Court finds in the ALJ's extensive and thorough discussion of Shakespeare-Fore's medical

history and treatment that the ALJ implicitly distinguished Dr. Kilburg's sitting and standing restrictions as inconsistent with the evidence in the record as a whole.[11] *See Wagner*, 499 F.3d at 848.

Therefore, having reviewed the entire record, the Court finds the ALJ properly considered and addressed the opinion evidence provided by Dr. Kilburg. Also, the Court finds the ALJ provided "good reasons" for rejecting Dr. Kilburg's opinions. *See Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301.

### 2. *Credibility Determination*

Shakespeare-Fore argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Shakespeare-Fore maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Shakespeare-Fore's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a

---

[11] *See* Administrative Record at 18-26 (providing a thorough review and discussion of Shakespeare-Fore's medical history, treatment, and objectively verifiable functional restrictions).

claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective

testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In her decision, the ALJ first addressed examples of inconsistencies between the objective medical evidence and Shakespeare-Fore's subjective allegations. The ALJ found that Shakespeare-Fore: (1) had a fairly unremarkable MRI of her spine in July 2009;[12] (2) a treating physician, Dr. Roes, suspected malingering or histrionic behavior when Shakespeare-Fore described her pain;[13] and (3) despite complaining of shoulder pain and claiming lifting restrictions, within a year of her 2009 injury, her shoulder showed "significant" improvement.[14] Furthermore, in addressing various treating and consultative examining medical source opinions, the ALJ also thoroughly explained the inconsistencies between the objective medical evidence and Shakespeare-Fore's subjective allegations.[15]

Next, the ALJ addressed Shakespeare-Fore's activities of daily living:

> Indeed considering . . . [Shakespeare-Fore's] activities of daily living, the Administrative Law Judge finds sufficient evidence that she would be capable of the sedentary work described in the above-listed residual functional capacity assessment. These activities include caring for her pets, doing laundry, putting away dishes, going to the grocery store, preparing meals three times per day, baking for up to two hours at a time, paying

---

[12] *See* Administrative Record at 18.

[13] *Id.* (The ALJ noted that Dr. Roes "described her statements trying to convince him about the extent of her pain as "bizarre" and "unwarranted." [Shakespeare-Fore] was speaking very fast, and she reported how significant her pain was an how she never lied about that, "as if almost to convince herself." In fact, that doctor concluded his comments by expressing his suspicion about malingering or histrionic behavior[.]").

[14] *Id.* at 19.

[15] *Id.* at 18-25 (providing a thorough review of Shakespeare-Fore's medical history, treatment, and opinions from treating and consultative examining doctors).

bills, using her computer to elicit business, cleaning up after the dogs in her back yard, and organizing her home (Exhibit 12F, page 7; Exhibit 19E, generally). [Shakespeare-Fore] also was performing work duties for her own business. Such tasks show that [she] can engage in a variety of tasks despite her subjective pain complaints, and they show that she would be able to sit, lift, carry, and be on her feet as required by the sedentary work described in the above-listed residual functional capacity assessment.

[Shakespeare-Fore's] activities also suggest [her] psychological difficulties are not as severe as she claims. The tasks described in the preceding paragraph showed that [she] remained capable of starting and completing most household activities. In fact, they indicate she moves about the house throughout the day attending to various responsibilities that would require her to stand, sit and lift to complete tasks under the typical stresses of running a household. As such, the Administrative Law Judge finds no more than mild restrictions in that regard.

(Administrative Record at 21-22.)

Lastly, the ALJ addressed additional factors:

[Shakespeare-Fore] is receiving unemployment (Exhibit 10D). She has reported looking for work, taking photographs, training dogs, performing marriages, mowing the lawn, baking for two hours (Exhibit 12F, page 7), and doing home exercises (e.g., Exhibit 29F, page 9). [She] reported more activity to doctors than she did at the hearing or to the Social Security Administration (e.g., Exhibits 3E, 4E, 6E, 9E, and 11E).

(Administrative Record at 24.)

The ALJ concluded that:

Despite [Shakespeare-Fore's] allegations, several circumstances undermine the validity of her subjective complaints such that the remaining objective evidence warrants only those restrictions in the previously listed residual functional capacity assessment. Specifically, indications of

[her] drug-seeking behavior, requests for specific work restrictions from her physicians, her activities of daily living, reports of malingering and histrionic behavior, and the sparseness of her psychological treatment considered with objective imaging of her lumbar spine showing no neural compromise suggests she remains capable of sedentary work.

Overall, [Shakespeare-Fore] asserts the majority of symptoms based on her subjective complaints. There is little objective evidence to corroborate conditions that would correlate to such extreme debilitation. When considering these circumstances with [her] activities of daily living, drug seeking behavior, and indications of malingering and histrionic tendencies, the Administrative Law Judge finds the weight of the evidence favors finding [Shakespeare-Fore] capable of work as described in the above-listed residual functional capacity assessment.

(Administrative Record at 25.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Shakespeare-Fore's treatment history, medical history, medication use, functional restrictions, employment, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Shakespeare-Fore's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Shakespeare-Fore's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if

inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. RFC Assessment

Shakespeare-Fore argues that ALJ's RFC assessment is flawed and not supported by substantial evidence. Specifically, Shakespeare-Fore argues that the ALJ failed to properly consider the opinions of her treating doctor, Dr. Manshadi, treating chiropractor, Dr. Don Miller, D.C., and the opinions of consultative doctors, Dr. Mraz and Dr. Kappos.[16] Shakespeare-Fore maintains that this matter should be remanded for further consideration of her RFC in light of the opinions of these medical sources.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

---

[16] In her brief, Shakespeare-Fore incorrectly identifies Dr. Kappos as Dr. Kuhnlein, a physician who practices with Dr. Kappos.

In considering medical source evidence, an ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship,

(3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In assessing a consultative medical source, an ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Finally, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-

adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In determining Shakespeare-Fore's RFC, the ALJ thoroughly addressed and discussed in great detail the opinions of her treating sources, examining sources, and non-examining sources, including the opinions of Dr. Manshadi, Dr. Miller, Dr. Mraz, and Dr. Kappos.[17] For example, the ALJ addressed Dr. Manshadi's opinions at length and gave them little weight because they were internally inconsistent, inconsistent with other objective medical evidence, and the results of his examinations were inconsistent with the functional limitations he found for Shakespeare-Fore.[18] Similarly, the ALJ gave little weight to the opinions of Dr. Miller because his opinions were inconsistent with objective medical evidence, including MRIs of Shakespeare-Fore's lower back and reports of other physicians showing unremarkable physical examinations.[19]

As for Dr. Mraz, the ALJ addressed his opinions as follows:

> Given [Shakespeare-Fore's] history of histrionic behavior, as mentioned above, and her obvious reluctance to work for her past employer, despite their assurances they would work within her restrictions (Exhibit 1F), the Administrative Law Judge gives the assessment of [Dr. Mraz] little weight. [Shakespeare-Fore] obviously retained the ability to read and comprehend written items, as well as carry out instructions, during her examination two years earlier. Had the Administrative Law Judge found treatment records showing

---

[17] *See* Administrative Record at 18-26 (providing a thorough and detailed discussion of Shakespeare-Fore's medical history, including addressing the opinions of treating, examining, and non-examining medical sources).

[18] *Id.* at 19-20.

[19] *Id.* at 20.

[Shakespeare-Fore] complaining of deterioration in that regard during the interim, such findings would carry greater weight. The Administrative Law Judge found only eight instances of treatment in that time for medication management. While [Shakespeare-Fore] occasionally complained of memory and concentration difficulties, other times she noted her concentration and memory were good, or she did not mention any problem at all in that area. (Exhibit 43F, generally). In addition, [she] had her own business. . . . As such, the Administrative Law Judge gives little weight to the opinion and observations of [Dr. Mraz].

(Administrative Record at 23.) Similarly, with regard to Dr. Kappos' opinions, the ALJ determined that:

[Dr. Kappos] appears to base his opinions on the subjective reports of [Shakespeare-Fore] and the unverified limitations imposed by unnamed third sources. The report indicated that the examiner learned of [Shakespeare-Fore's] physician assigned restrictions from [Shakespeare-Fore] herself. Some of these limitations, such as pushing and pulling, no more than twenty pounds or going up and down stairs more than five minutes, have no basis in the record. The Administrative Law Judge finds no reference to such restrictions from any source. . . . Admittedly, [Dr. Kappos] found moderately reduced lumbar range of motion and positive straight leg raise test results, but the objective findings of any deficits ended there. Even that finding did not describe [Shakespeare-Fore's] effort in movement. The examination also found full extremity strength, easy gait, no difficulty heel or toe walking, ease with getting on and off the examination table, and full range of motion in all other joints. (Exhibit 38F, pages 8-9). Considering these findings, [Dr. Kappos] more likely than not based the extent of the assigned restrictions on [Shakespeare-Fore's] subjective reports of pain and the restrictions she claimed to have received from other sources. As such, the opinions of [Dr. Kappos] are given little weight.

(Administrative Record at 20-21.)

The ALJ concluded that:

> Overall, [Shakespeare-Fore] asserts the majority of symptoms based on her subjective complaints. There is little objective evidence to corroborate conditions that would correlate to such extreme debilitation. When considering these circumstances with [her] activities of daily living, drug seeking behavior, and indications of malingering and histrionic tendencies, the Administrative Law Judge finds the weight of the evidence favors finding [Shakespeare-Fore] capable of work as described in the above-listed residual functional capacity assessment.

(Administrative Record at 25.)

Having reviewed the entire record, the Court finds that the ALJ properly considered Shakespeare-Fore's medical records, observations of treating physicians, and Shakespeare-Fore's own description of her limitations in making the ALJ's RFC assessment for Shakespeare-Fore.[20] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. As for the opinion evidence, the Court finds that the ALJ properly considered and addressed the opinion evidence provided by Dr. Manshadi, Dr. Miller, Dr. Mraz, and Dr. Kappos. Also, the Court finds the ALJ provided "good reasons" for weight given to Dr. Manshadi's, Dr. Miller's, Dr. Mraz's, and Dr. Kappos' opinions. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 301. Therefore, the

---

[20] *See* Administrative Record at 18-26 (providing thorough discussion of the relevant evidence for making a proper RFC determination).

Court concludes that Shakespeare-Fore's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

## 4. Hypothetical Question

Shakespeare-Fore argues that the ALJ's hypothetical question to the vocational expert was incomplete because it did not properly account for all of her impairments. Shakespeare-Fore also argues that the ALJ's hypothetical was incomplete and did not contemplate all of her functional limitations. Shakespeare-Fore maintains that this matter should be remanded so that the ALJ may provide the vocational expert with a proper and complete hypothetical question.

Hypothetical questions posed to a vocational expert, including a claimant's RFC, must set forth his or her physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985).").

Having reviewed the entire record, the Court finds that the ALJ thoroughly considered and discussed both the medical evidence and Shakespeare-Fore's testimony in determining Shakespeare-Fore's impairments.[21] The Court further determines that the ALJ's findings and conclusions are supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert by the ALJ was based on the ALJ's findings and conclusions, the Court concludes that the ALJ's

---

[21] *See* Administrative Record at 18-26.

hypothetical question properly included those impairments which were substantially supported by the record as a whole. *See Goose*, 238 F.3d at 985; *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible). Therefore, the ALJ's hypothetical question was sufficient.

## V. CONCLUSION

The Court finds that the ALJ considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record, including proper consideration and weighing of the opinions of Dr. Kilburg, Dr. Manshadi, Dr. Miller, Dr. Mraz, and Dr. Kappos. The ALJ also properly determined Shakespeare-Fore's credibility with regard to her subjective complaints of disability and pain. Lastly, the ALJ's hypothetical question to the vocational expert properly included those impairments substantially supported by the record as a whole. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

1.    The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this _24th_ day of March, 2015.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA